D. Maimon Kirschenbaum
Leah Seliger
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 688-2548 (fax)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

| | |
|---|---|
| **RICHARD BOSSUK,** | |
| **Plaintiff,** | **Case No.:** |
| v. | **COMPLAINT** |
| **AUGUSTA SPORTSWEAR, INC. and JASON LIVERMORE,** | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

-----------------------------------------------------------x

Plaintiff Richard Bossuk alleges as follows:

1. Augusta Sportswear, Inc. CEO David Elliot often speaks about the "Augusta family culture" when addressing the teams of employees that sell the company's products to clients across the country. He encourages employees to feel they are part of a network where each one of them is an important member of the "family."

2. In reality, however, if Augusta Sportwear, Inc. is like a family, then it is one where its elders are not valued, and Jews are not welcome.

**JURISDICTION AND VENUE**

3. Plaintiff Richard Bossuk brings this action against Defendants alleging discrimination claims brought under 42 U.S. Code § 1981 ("Section 1981"); New York State

1

Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"); and New York City Human Rights Law, ("NYCHRL"), New York Administrative Code §§ 8-107(1), *et al*.

4. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under Section 1981. This Court has supplemental jurisdiction over the New York state law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5. Venue is proper in this District because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PARTIES

6. Defendant Augusta Sportswear, Inc. ("Defendant Augusta" or the "Company") is a designer, manufacturer, and marketer of activewear for teams and fans. Defendant Augusta is comprised of five brands—Augusta Sportswear, Holloway, Russell Athletic, High Five and Pacific Headwear – which, together, form the largest supplier of youth to adult team uniforms in the country.

7. Defendant Jason Livermore ("Defendant Livermore") is the National Sales Manager for Defendant Augusta and was Plaintiff Bossuk's direct supervisor from 2016 until Plaintiff's termination in 2021.

8. All Defendants collectively will be referred to as the "Defendants."

9. Plaintiff Richard Bossuk ("Plaintiff Bossuk" or "Plaintiff") worked for Defendant Augusta as a sales representative from March 13, 2013 until his unlawful termination on January 8, 2021.

## FACTS

### Age and Race Discrimination Claims

10. Plaintiff began working for Defendant Augusta as a sales representative ("sales rep") in April of 2013. He initially covered sales for all of New York state.

11. Plaintiff is a 61-year-old Jewish male.

12. Augusta is a designer, manufacturer, and marketer of activewear for teams and fans. Augusta is comprised of five brands—Augusta Sportswear, Holloway, Russell Athletic, High Five and Pacific Headwear – which, together, form the largest supplier of youth to adult team uniforms in the country.

13. Upon information and belief, Plaintiff was the only Jewish sales rep employed by Augusta during the relevant period described herein.

14. In 2016, Augusta consolidated its three brands at the time - Augusta Sportswear, Holloway, and High Five - into one company, and brought on new leadership to revamp the image and strategy of the Company. At the time, Dave Elliot joined the Company as its President and CEO, and Derek Ernst joined as its Senior Vice President of Marketing and Merchandising.

15. After the 2016 consolidation, Plaintiff's sales region also changed from all of New York state to the five boroughs of New York City, and surrounding areas such as the Hudson Valley, Long Island, Bergen County and Fairfield County.

16. Upon information and belief, Derek Ernst, SVP of Marketing and Merchandising, made a statement to other leadership that "Young guys are the future of this company."

17. In fact, over the next several years, the Company did systematically fire at least five additional sales reps who were all over 50 years old.

18. Defendant Livermore became the Eastern Regional Sales Manager for Augusta in or about November 2017. At that time, he also became Plaintiff's direct supervisor. As Eastern Regional Sales Manager, Livermore supervised approximately 23 sales reps, including Plaintiff. At that time, Plaintiff was one of the oldest sales reps on Defendant Livermore's team. Upon information and belief, at the time Plaintiff was terminated, he was the oldest sales rep on Defendant Livermore's team. Plaintiff was also the only Jewish sales rep on Defendant Livermore's team throughout his tenure with Augusta.

19. In mid-2020 Livermore became the National Sales Director. In this role he supervised approximately 60 sales reps. He remained Plaintiff's direct supervisor until Plaintiff's termination on January 8, of 2021. Livermore is approximately 43 years old.

20. From the time Plaintiff began working for Augusta in 2013 until Livermore became Plaintiff's supervisor in 2017, Plaintiff consistently received outstanding performance reviews. In October of 2016, a long-standing customer wrote to the Company that after ten years of being a client of Augusta, Plaintiff was the first sales rep to show up at their door, introduce himself, and have a positive and personal impact on their entire operation. Plaintiff's "old school" style of building authentic relationships with his clients proved invaluable. As the Connecticut client said, "I'm sure our numbers will show an increase since he has been our rep."

21. Over the years, Plaintiff received numerous similar commendations from his clients and colleagues within the Company.

22. Plaintiff not only went above and beyond expending his efforts for his own sales, he also went the extra mile to see the Company as a whole succeed. For example, twice a year the sales team attended a trade show in Atlantic City. While the younger sales reps often spent much of the day socializing with each other and waiting for customers from their individual regions to

attend the Company booth, Plaintiff greeted every potential customer that wandered in regardless of whether they would affect his own bottom line. While his younger colleagues enjoyed themselves and socialized with each other, Plaintiff worked overtime, skipping meals for an entire day, to work the crowd and build excitement for the brand. Even Defendant Livermore noted Plaintiff's diligent efforts.

23. Plaintiff constantly kept up with trends in the industry and wrote emails to Company leadership informing them of areas where Augusta could increase its competitiveness – even if those departments would not necessarily grow his own business.

24. Plaintiff consistently had some of the highest sales volume on his team, and his sales growth exceeded the growth of the Company every year until 2020. In 2019, while the Company's sales grew by seven percent, Plaintiff's sales grew by 15 percent, earning him a significant bonus.

25. However, despite Plaintiff's success each year, Defendant Livermore inexplicably gave him the minimum raise each year rather than the maximum four percent raise he clearly deserved. Under Plaintiff's previous supervisors, he received the maximum four percent increase in compensation.

26. Livermore also treated Plaintiff differently than the other sales reps on his team – all of whom were younger than Plaintiff and none of whom were Jewish.

27. For example, while serving as Eastern Regional Sales Manager, Defendant Livermore frequently accompanied the 23 sales reps he managed at the time on trips to meet with clients in their territories. These trips showed support for the sales rep and built rapport for the Company with clients. Even though Plaintiff requested that Defendant Livermore join him on multiple occasions over the years, Defendant Livermore never did join him to a single meeting. In

5

fact, Defendant Livermore traveled with at least 18 of his 23 sales reps. All of those 18 sales reps were under 60 years old.

28. Defendant Livermore also frequently interacted with and assisted his younger and non-Jewish sales reps. By contrast, he often completely ignored or delayed responding to Plaintiff's inquiries for days or weeks at a time.

29. Soon after Defendant Livermore became Plaintiff's supervisor, one of Plaintiff's colleagues who had worked with Defendant Livermore for years warned Plaintiff, "[Livermore]'s a good ol' boy from Alabama. I wouldn't flaunt your Judaism around that guy."

30. Although Plaintiff did not believe that his religion would be an issue with his new supervisor, Defendant Livermore clearly did have an issue with his Jewish background.

31. In or about March of 2018, Defendant Livermore heard Plaintiff speaking with a client during a trade show about the upcoming Passover holiday. Defendant Livermore said to Plaintiff, in a disgusted tone, "Are you a 'seder' guy?" referring to the Jewish ceremony performed during the Passover holiday.

32. At another trade show that same year, one of Plaintiff's customers, who happened to be Jewish, wanted to return an order. Defendant Livermore, wanting Plaintiff to discourage the return, derided him saying, "He's one of your people, go charm him."

33. In August of 2018, Plaintiff's mother passed away. In response, Defendant Livermore callously said to Plaintiff, "I know you people do something weird, so you go do what you need to do."

34. In or about March of 2019, at a trade show in Atlantic City, Defendant Livermore and several other sales reps noticed a man dressed in traditional Orthodox Jewish clothing.

Defendant Livermore made snide comments about the ostensibly Jewish man, laughing and pointing at the man with the other non-Jewish sales reps.

35. These comments and behaviors made Plaintiff feel extremely uncomfortable.

36. Defendant Livermore also did not support Plaintiff in the way he supported the younger and non-Jewish sales reps on his team. He subjected Plaintiff to greater scrutiny than the other sales reps and often sought out ways to criticize Plaintiff even when he was successful.

37. For example, in or about 2018, Plaintiff organized an event for local coaches at a restaurant. The event allowed the coaches to network with each other and with his largest account. It also gave Plaintiff an opportunity to market Augusta's products to 40 or more potential customers for his account in one evening. The event that year was an enormous success and led directly to substantial growth in Plaintiff's sales for the Company. Rather than commending Plaintiff for the creative and successful event, Defendant Livermore reprimanded him for spending too much money on his corporate card. Plaintiff had held the same event several times prior to 2018 and had never received anything but praise about it from his previous supervisors.

38. Further in or about September of 2019, Defendant Livermore wrote up Plaintiff for alleged misuse of his corporate credit card. It was the first time in his career that he had been questioned about such expenditures or that any insinuation was ever made about his integrity with respect to a corporate card. Upon information and belief, Plaintiff's younger colleagues were encouraged to use their corporate cards for the very same types of expenditures that had earned Plaintiff a writeup.

39. In fact, after Defendant Livermore wrote him up for expenditures that would be considered normal by any other younger or non-Jewish sales representative, Plaintiff responded with a full explanation of why he invested the expenditures in the particular clients involved,

including a detailed explanation of the return on investment of his three largest corporate card expenditures, including the large event for South Shore Outdoor – Plaintiff's biggest account.

40. This did not deter Defendant Livermore from continuing to treat Plaintiff differently than his younger and non-Jewish peers.

41. Defendant Livermore also would ignore or delay responding to Plaintiff's inquiries for days or even weeks, causing him to encounter issues with his clients. For example, in or about 2017, one of his large accounts – Diamondback Promotions and Sportswear – wanted to speak with Defendant Livermore about his account. Rather than speaking to Plaintiff's client to show support for Plaintiff and good will toward the client, Defendant Livermore emailed Plaintiff in all capital letters saying, "YOU'RE THE REP. I DON'T WANT TO TALK TO THEM." Upon information and belief, Defendant Livermore made himself readily available to speak with clients of his younger or non-Jewish sales reps.

42. On another occasion, in February and March of 2020, Plaintiff contacted Defendant Livermore repeatedly requesting an approval and feedback to move forward with developing a client. Defendant Livermore ignored Plaintiff's communications for nearly a month, causing the client to tell him that he was planning to look elsewhere to source his products.

43. Generally, March through May comprises approximately 40 percent of Plaintiff's business for the entire year. During those months all the youth football, baseball and basketball leagues and organizations order their uniforms and athletic apparel.

44. However, in March of 2020, the international Covid-19 pandemic caused all sports – and just about every other endeavor – to come to a screeching halt. By March of 2020, every school, club and little league team sport was cancelled for the duration of the 2020 season. Within days of the pandemic decimating New York City, Plaintiff saw many of his largest clients

cancelling and returning their orders. With sports seasons cancelled, his clients no longer needed their uniforms and sports gear.

45. Plaintiff warned Defendant Livermore of the likelihood that certain clients would not be ordering that season as a result of the pandemic. Defendant Livermore responded saying, "that makes sense."

46. At the same time, Plaintiff continued to hustle and maintain relationships with all of his clients and even sought out new clients. In April of 2020, the Company's new hat manager thanked him for bringing in new business in his department in the midst of the pandemic. Defendant Livermore did not thank or praise Plaintiff's efforts for that accomplishment or for anything else.

47. While hundreds of people were dying every day in New York City, Defendant Livermore did not bother to call Plaintiff even once to inquire about his well-being. Upon information and belief, Defendant Livermore remained in regular contact with the younger and non-Jewish sales reps on his team. Despite Plaintiff's extraordinary sales in 2019, Mr. Ernst and Mr. Elliott also did not reach out to Plaintiff in 2020 when Covid-19 wreaked havoc on Plaintiff's business, which was centered in New York City – an area uniquely hard-hit by the pandemic.

48. Defendant Livermore again revealed why he was treating Plaintiff differently in April of 2020. One of Plaintiff's biggest clients, who is Jewish, requested a better price on one of his orders. Plaintiff had to approve all discounts on pricing with Defendant Livermore. When Plaintiff brought the request to his supervisor, Defendant Livermore responded, "I know the animal [referring to the client's Jewish descent]. I know what he's trying to do." Shortly after the call, perhaps recognizing he had been too open about his disdain for Jewish people, Defendant

Livermore sent a text to Plaintiff saying, "hey man, just a reminder, please keep our convo confidential."

49. Later in 2020, Defendant Livermore rescheduled an important virtual sales conference for the entire sales team to occur on Yom Kippur, a major Jewish holiday.

50. Even during the ongoing Covid-19 pandemic, Defendant Livermore continued to sabotage Plaintiff's work by not responding to his communications. For example, in or about May of 2020, a school in Plaintiff's area made an inquiry about ordering products from Augusta. Defendant Livermore ignored Plaintiff's many attempts to contact him with follow-up about the potential customer.

51. On July 10, 2020, Plaintiff contacted Defendant Livermore with a request from a client. Five days later, and many frustrated client communications later, Defendant Livermore had still not condescended to acknowledge Plaintiff's attempts to contact him.

52. Over and over, Defendant Livermore demonstrated that he was not available to support Plaintiff, and instead subjected him to unfounded criticism and blame. Plaintiff constantly sensed that Defendant Livermore was looking for reasons to fire him, causing him immense stress and anxiety. However, because of his undeniable sales performance, Defendant Livermore was unable to find a reason to terminate him.

53. However, in 2020 when the entire Company's business dropped precipitously, Defendant Livermore found a way to get rid of the one older Jewish sales rep on his team.

54. Throughout 2020, a new customer service agent was assigned to Plaintiff's accounts. The new agent repeatedly failed to provide prompt or thorough responses to Plaintiff's clients, causing significant harm to his sales and business relationships.

55. For example, in September of 2020, the customer service agent failed to respond to an order from one of Plaintiff's clients for two weeks. As a result, the client, who was accustomed to Plaintiff's quick response time, emailed Plaintiff about his frustration with the service he received.

56. On a separate occasion, one of Plaintiff's long-time clients called him in tears because the same customer service agent failed to provide her with any information about a delay in her order, causing her to look incompetent in front of her own customers.

57. On another occasion in September of 2020, the customer service agent failed to respond at all to an urgent order request from a large buying group. That failure to respond directly caused the client to purchase his order elsewhere. In response to that loss of business and the damage done to Plaintiff's hard-earned business relationship, Plaintiff sent the agent an email stating that it is a basic courtesy and business necessity to respond to clients. Plaintiff also noted that it was not the first time he had expressed the need to communicate effectively with clients.

58. Upon information and belief, the customer service agent was having similar issues with other sales reps throughout the same period. The agent was ultimately moved to a different department in the Company as a result of his repeated performance issues.

59. Nevertheless, on October 1, 2020, Defendant Livermore wrote up Plaintiff for admonishing the customer service agent for his unprofessional behavior toward Plaintiff's clients.

60. Throughout Plaintiff's tenure with Augusta, he built strong relationships with his customer service colleagues, frequently sending them gifts as a token of his gratitude for their collaboration.

61. Further, despite nearly a decade of excellent work, Defendant Livermore indicated that this write-up would be Plaintiff's final warning and any future issue would result in Plaintiff's immediate termination.

62. Defendant Livermore indicated in the write-up, ironically, that he was not a team player and was guilty of "insubordination" with absolutely no factual basis. Defendant Livermore also accused Plaintiff of "poor preparedness" and "lack of follow through" – exactly the issues plaguing the ineffectual – and younger – customer service agent and not Plaintiff.

63. Defendant Livermore was clearly looking for any reason to incriminate Plaintiff and get him off his team. Plaintiff, in the interest of moving forward and focusing on his job, signed the baseless write-up and added his own comments to clarify what happened. Upon information and belief, Defendant Livermore never provided Augusta's human resources department ("HR") with Plaintiff's feedback and the writeup was filed without such feedback.

64. Exactly two months later, on January 8, 2021, Defendant Livermore called Plaintiff and said, "Rich, you're done. Here's HR." Plaintiff was then left to discuss this shocking termination with HR.

65. Plaintiff certainly was not fired for performance related reasons. He had a 100 percent record of growing sales every year until the Covid-19 pandemic obliterated team sports and corporate sales in his region in 2020. The effects of the pandemic were particularly dire in Plaintiff's region and in New York City, and the Company overall lost approximately 50 percent in sales.

66. When Plaintiff asked for the reason, he was being terminated, he was told that the Company fired him because of Defendant Livermore's write-up and because he did not "fit the culture" of the Company.

67. Clearly the Augusta Company "culture" includes young employees and those who are not Jewish.

68. After speaking with HR a second time about his termination, the HR employee mentioned that it appeared Plaintiff's write-up had not been handled correctly, and she would be referring the situation to the Company's attorney.

69. Upon information and belief, after firing Plaintiff, Augusta gave his accounts to a significantly younger sales rep.

**FIRST CLAIM FOR RELIEF**
Section 1981 – Race Discrimination

70. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

71. In violation of Section 1981, Defendants intentionally and willfully discriminated against Plaintiff on the basis of his race.

72. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

73. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

74. As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages and damages for emotional distress, physical

injuries, and medical treatment, punitive damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

### SECOND CLAIM FOR RELIEF
**New York State Human Rights Law ("NYSHRL"),**
**N.Y. Exec. L. §§ 290 et seq. – Religious and Age Discrimination**

75. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

76. In violation of the NYSHRL, Defendants intentionally discriminated against Plaintiff on the basis of his religion and age.

77. Defendants' discrimination was sufficiently severe so as to affect the terms of Plaintiff's employment.

78. Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

79. As a direct and proximate consequence of Defendants' discrimination against Plaintiff, he has suffered, and continues to suffer, substantial monetary and non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation and anguish.

80. As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to: damages for lost wages, emotional distress, punitive damages, post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
**New York City Human Rights Law, New York Administrative Code §§ 8-107(1), *et al*.**
**("NYCHRL") – Religious and Age Discrimination**

81. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

82. In violation of the NYCHRL, Defendants discriminated against Plaintiff on the basis of his religion and age.

83. As a direct and proximate consequence of Defendants' discrimination against Plaintiff, Plaintiff suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income and employment benefits.

84. As a direct and proximate consequence of Defendants' discrimination against Plaintiff, Plaintiff suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation and anguish.

85. As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to backpay, lost employment benefits, and damages for emotional distress, as well as front pay, punitive damages, post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

(A) For compensatory, liquidated and punitive damages in an amount to be determined by the trier of fact;

(B) For reasonable attorneys' fees, interest, and costs of suit;

(C) For such other and further relief as the Court may deem just and equitable.

Dated: New York, New York  
October 7, 2021

Respectfully submitted,  
JOSEPH & KIRSCHENBAUM LLP

By: */s/ D. Maimon Kirschenbaum*  
D. Maimon Kirschenbaum  
Leah Seliger  
32 Broadway, Suite 601  
New York, NY 10004  
Tel: (212) 688-5640  
Fax: (212) 688-2548

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which they have a right to jury trial.